UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICARDO ANAYA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 14-cv-5703 |
| v. ) | |
| ) | Judge John W. Darrah |
| DIRECTV, LLC and ) | |
| DIRECTSAT USA, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

On March 5, 2015, Plaintiffs filed a First Amended Complaint ("FAC") against Defendants DIRECTV, LLC and DirectSat USA, LLC.[1] The First Amended Complaint alleges violations of the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 201, *et seq.*; the Illinois Wage Payment and Collection Act (the "IWPCA"), 820 Ill. Comp. Stat. 115/1 *et seq.*; and the Illinois Employee Classification Act (the "IECA"), 820 Ill. Comp. Stat. 185/3 *et seq*. Defendants have filed Motions to Dismiss [100, 108] pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted.[2] For the reasons discussed below, Defendants' Motions to Dismiss [100, 108] are granted.

## BACKGROUND

DIRECTV is a Delaware corporation with its principal place of business in El Segundo, California. (FAC ¶ 16.) DirectSat is a Delaware limited liability company with its principal

---

[1] Plaintiffs Ricardo Anaya, David Blake, Javier Cruz, Danyale Gage, Bill Intzekotis, Daniel Sobieszek, and Andrew Cyprian bring claims against both Defendants. Plaintiffs Steven Erhart, Milan Puljezevic, and Mario Romero bring claims solely against DIRECTV.

[2] The parties were granted leave to file briefs in excess of the local page limit. *See* (Dkt. 88.) The parties are instructed to again seek leave of court to exceed the page limit for any future briefing.

place of business in King of Prussia, Pennsylvania. (*Id.* at ¶ 17.) Plaintiffs are individuals residing in Illinois. (*Id.* at ¶¶ 6-15.) Plaintiffs worked as satellite television installation technicians whose principal duty was to install and repair DIRECTV satellite television service. (*Id.* at ¶ 20.)

DIRECTV controls and manages their service technicians by either employing them directly ("W-2 Employees") or through an employment network of service providers (the "Provider Network"), consisting of Home Service Providers ("HSPs"), including DirectSat, Secondary Service Providers ("Secondary Providers"), subcontractors, and service technicians. (*Id.* at ¶ 21.) DIRECTV was the primary client of the HSPs and Secondary Providers and was the source of substantially all of their income. (*Id.* at ¶ 23.) During the relevant time period, DIRECTV merged with or acquired several HSPs. (*Id.* at ¶ 24.) DIRECTV regularly gives providers "extraordinary advance payments" in order to keep providers afloat. (*Id.* at ¶ 41.) DIRECTV has absorbed several Providers through acquisition; and, to date, there are only three independent HSPs in operation, including DirectSat. (*Id.* at ¶ 42.)

DIRECTV controls the Provider Network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers then enter into contracts with largely captive entities that DIRECTV refers to as subcontractors; and those subcontractors then enter into contracts with the technicians who install the satellite television equipment. (*Id.* at ¶ 25.) In some cases, the HSPs and Secondary Providers contract directly with technicians. (*Id.*) DirectSat passed along scheduling from DIRECTV and provided supervision of some technicians. (*Id.* at ¶ 26.) DirectSat maintained a contractor file for each technician working for them. (*Id.* at ¶ 27.) The files were regulated and audited by DIRECTV. (*Id.*) The technicians were called 1099 technicians or independent contractors. (*Id.*) DirectSat had the ability to

2

enter into and terminate contracts with the 1099 technicians. (*Id.* at ¶ 28.) DirectSat also maintained warehouses where 1099 technicians had to pick up some equipment and take some training. (*Id.* at ¶ 29.)

Technicians had to install DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards as required by DIRECTV. (*Id.* at ¶ 30.) DIRECTV uses Provider Agreements to ensure that technicians perform their work as specified, and Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements. (*Id.* at ¶ 32.) The Provider Agreements control almost all facets of the technicians' work. (*Id.* at ¶ 33.) Each technician is assigned a work order through a centralized computer software system that DIRECTV controls. (*Id.* at ¶ 34.) DIRECTV mandates certain methods and standards of installation. (*Id.*) Because of this, each technician's job duties are virtually identical. (*Id.*) DIRECTV used a database program known as SIEBEL to coordinate the assignment of work orders to technicians, using a unique "Tech ID Number" for each technician. (*Id.* at ¶ 35.) Upon arriving at each work site, technicians were required to check-in with DIRECTV. (*Id.* at ¶ 37.) After an assigned job, technicians were required to report to DIRECTV that the installation was complete. (*Id.*) Through the SIEBEL system, DIRECTV and the providers control who can perform work and have the ability to effectively terminate any technician by ceasing to issue work orders. (*Id.* at ¶ 56.)

Plaintiffs were required to purchase and wear a uniform with the DIRECTV insignia on it and to display the DIRECTV insignia on vehicles driven to customers' homes. (*Id.* at ¶ 38.) Plaintiffs were made to hold themselves out as agents of DIRECTV. (*Id.* at ¶ 48.) DIRECTV also requires that all technicians pass pre-screening and background checks and obtain a certification from the Satellite Broadcasting & Communications Association before they could

3

be assigned work orders. (*Id.* at ¶ 51.) Independent contractor Plaintiffs were also required to purchase supplies necessary to perform installations and were required to provide all maintenance and to purchase all gas for the vehicles they drove between customers' homes. (*Id.* at ¶ 72.)

Plaintiffs were compensated on a piece-rate payment scheme that is utilized throughout DIRECTV's network. (*Id.* at ¶ 62.) Under the piece-rate system, technicians are paid on a per-task basis for certain enumerated "productive" tasks. (*Id.* at ¶¶ 66-67.) Plaintiffs were not compensated for assembling satellite dishes, transportation to and from assignments, reviewing and receiving schedules, contacting customers to confirm installations, obtaining required supplies, assisting other technicians, performing required customer education, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on installations where Plaintiffs had to return and perform additional work on previously completed installations ("chargebacks"). (*Id.* at ¶ 68.) There was no contract, memorandum, or other document between Plaintiffs and Defendants memorializing or explaining the pay system. (*Id.* at ¶ 65.)

DIRECTV and providers' quality control personnel reviewed Plaintiffs' work and imposed "chargebacks" and/or "rollbacks" based on those reviews. (*Id.* at ¶ 55.) Chargebacks were deductions from technicians' pay if there were issues with an installation or questions from a customer. (*Id.* at ¶ 71.) Such issues included: faulty equipment, improper installation, customer calls on how to operate their remote control, and customers' failure to give greater than a ninety-five percent satisfaction rating for the services provided. (*Id.*)

4

Plaintiffs allege that they were routinely required to work more than forty hours per week while being denied overtime pay and being subjected to an effective wage rate below that required by law. (*Id.* at ¶ 76.)

## LEGAL STANDARD

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). However, plaintiffs are not required to "plead the elements of a cause of action along with facts supporting each element." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 517 (7th Cir. 2015). Rather, the complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555). When evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

## ANALYSIS

### *Count I - FLSA*

In Count I, Plaintiffs allege that Defendants violated the FLSA by failing to pay overtime wages. Defendants argue that Plaintiffs have not shown that an employer-employee relationship

5

existed for the purposes of the FLSA. Employer is defined as including "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The "FLSA contemplates several simultaneous employers who may be responsible for compliance with the FLSA." *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011) (citing *Falk v. Brennan*, 414 U.S. 190, 191 (1973)). For a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee. *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008).

Courts look at various factors to determine whether an entity is a joint-employer, including whether the alleged employer "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records." *Moldenhauer*, 536 F.3d at 644 (quoting *Moreau v. Air France*, 343 F.3d 1179, 1182 (9th Cir. 2003)). The economic reality of the situation controls whether the FLSA applies. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961). The FLSA "has been construed liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959).

Defendants argue that Plaintiffs have not sufficiently alleged Defendants had the power to hire or fire them, determine the rate or method of their pay, or had maintained records pertaining to their alleged employment. Plaintiffs do not allege that DIRECTV had the power to hire or fire them. Plaintiffs do claim that DIRECTV could effectively terminate any technician by ceasing to issue work orders. (FAC ¶ 54.) While Plaintiffs allege that DirectSat had the ability to enter into and terminate contracts with the 1099 technicians, Plaintiffs do not allege that they, themselves, were 1099 technicians. (*Id.* at ¶ 28.)

6

Plaintiffs allege that DIRECTV entirely supervised and controlled employee work schedules by issuing work orders through their centralized computer software system, SIEBEL. (*Id.* at ¶¶ 34, 54.) DIRECTV further determined the policies, procedures, practices, and performance standards for installing its service. (Id. at ¶ 30.) While DIRECTV determined what tasks were compensable and what tasks were not, there is no allegation that they determined the rate of compensation. (*Id.* at ¶ 47.) There is no allegation that DirectSat determined what tasks were compensable or the rate of compensation. Plaintiffs admit that providers, and not DIRECTV, paid Plaintiffs using their own payroll and paycheck systems. (*Id.*) It is not clear whether DirectSat was one of those providers. There is also no allegation of any agreement or contract with either Defendant explaining how Plaintiffs were paid. (*Id.* at ¶65). Plaintiffs allege that DirectSat kept a contractor file for each technician and that those files were regulated and audited by DIRECTV. (*Id.* at ¶ 27.) They further allege that the contractor files are analogous to a personnel file. (*Id.*)

Plaintiffs have not sufficiently alleged that DIRECTV and DirectSat were joint-employers for the purposes of the FLSA. As alleged, Defendants did not have the ability to actually hire or fire Plaintiffs, and Defendants did not determine the rate or method of Plaintiffs' payment. It is alleged that DIRECTV set certain standards and qualifications for technicians but this does not equate to hiring. And the quality-control work provided by DirectSat does not equate to the control of an employer. DIRECTV directed work tickets to technicians, but this did not result in directly controlling the schedule of employees. DirectSat is also alleged to have passed along scheduling from DIRECTV, but it is not clear if this refers to the SIEBEL system or something else. Plaintiffs have not sufficiently alleged that Defendants exercised control over their working conditions for the purposes of the FLSA.

7

Defendants' Motions to Dismiss Counts I are granted without prejudice.

*Counts II and III - IWPCA*

In Count II, certain Plaintiffs[3] allege a violation of the IWPCA due to Defendants' failure to pay all wages earned and unpaid by the next payday following the end of their employment. In Count III, certain Plaintiffs[4] allege a violation of the IWPCA in that Defendants' made deductions from wages or final compensation for chargebacks, failed to reimburse Plaintiffs for reasonable and necessary business expenses, and only partially compensated Plaintiffs for their earned straight-time and overtime wages and final compensation.

The IWPCA requires that a claim for compensation be based on a "contract or agreement" between employer and employee. 820 Ill. Comp. Stat. 115/2 (West 2010). Plaintiffs admit in their FAC that there was no written agreement between Plaintiffs and Defendants. (FAC ¶ 65.) Plaintiffs argue that claims to recover overtime wages and final payment under the IWPCA can be brought when Plaintiffs do not plead a specific employment contract or agreement, citing to *Wharton v. Comcast Corp*., 912 F. Supp. 2d 655 (ND. Ill. 2012). However, in *Wharton*, the court found that an employee handbook could serve as an agreement between the plaintiff and defendant. *Wharton v. Comcast Corp.*, 912 F. Supp. 2d 655, 660-61 (N.D. Ill. 2012). Plaintiffs in this case point to no agreement or contract whatsoever. Therefore, their IWPCA claims cannot proceed. Defendants' Motions to Dismiss Counts II and III are granted without prejudice.

---

[3] Plaintiffs in Count II include: Ricardo Anaya, David Blake, Javier Cruz, Steven Erhart, Danyale Gage, Bill Intzekotis, Milan Puljezevic, Daniel Sobieszek, and Mario Romero.

[4] Plaintiffs in Count III include: Ricardo Anaya, David Blake, Javier Cruz, Steven Erhart, Danyale Gage, Bill Intzekotis, Milan Puljezevic, Daniel Sobieszek, and Mario Romero.

*Count IV - IECA*

In Count IV, certain Plaintiffs[5] allege that Defendants violated the IECA by misclassifying Plaintiffs as independent contractors. "Our duty is to interpret the Act as best we predict the Illinois Supreme Court would." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). The Illinois Supreme Court has stated that "the [IECA] was enacted by the General Assembly with the express purpose to 'address the practice of misclassifying employees as independent contractors' in the construction industry." *Bartlow v. Costigan*, 13 N.E.3d 1216, 1221, 2014 IL 115152, ¶ 20 (Ill. 2014) (citing 820 Ill. Comp. Stat. 185/3 (West 2010)). The IECA provides that any individual "performing services" for a construction contractor is "deemed to be an employee of the employer." 820 Ill. Comp. Stat. 185/10(a) (West 2010). During the relevant times, contractor was defined as "any sole proprietor, partnership, firm, corporation, limited liability company, association or other legal entity permitted by law to do business within the State of Illinois who engages in construction . . . ." 820 Ill. Comp. Stat. 185/5 (West 2010). Construction was defined as

> any constructing, altering, reconstructing, repairing, rehabilitating, refinishing, refurbishing, remodeling, remediating, renovating, custom fabricating, maintenance, landscaping, improving, wrecking, painting, decorating, demolishing, and adding to or subtracting from any building, structure, highway, roadway, street, bridge, alley, sewer, ditch, sewage disposal plant, water works, parking facility, railroad, excavation or other structure, project, development, real property or improvement, or to do any part thereof, whether or not the performance of the work herein described involves the addition to, or fabrication into, any structure, project, development, real property or improvement herein described of any material or article of merchandise. Construction shall also include moving construction related materials on the job site to or from the job site.

---

[5] Plaintiffs in Count IV include: Ricardo Anaya, Danyale Gage, Bill Intzekotis, Milan Puljezevic, and Daniel Sobieszek.

9

820 Ill. Comp. Stat. 185/5. The FAC alleges that DIRECTV is a provider of satellite television services and describes DirectSat as performing "middle-management functions." (FAC ¶¶ 1, 26.) Defendants are not alleged to be contractors engaged in construction. As the express purpose of the IECA is to address the practice of misclassifying employees in the construction industry, the IECA does not apply here. Defendants' Motions to Dismiss Count IV are granted with prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss [100, 108] are granted. Defendants' Motions to Dismiss Counts I, II, and III are granted without prejudice. Defendants' Motions to Dismiss Count IV are granted with prejudice. Plaintiffs may file, within thirty days of this Order, an amended Complaint as to the allegations in Counts I, II, and III in strict compliance with the requirements of Federal Rule of Civil Procedure 11.

Date:     September 23, 2015

_____
JOHN W. DARRAH
United States District Court Judge