UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICARDO ANAYA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 14-cv-5703 |
| ) | |
| DIRECTV, LLC and ) | Judge John W. Darrah |
| DIRECTSAT USA, LLC, ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM OPINION AND ORDER

On March 5, 2015, Plaintiffs filed a First Amended Complaint ("FAC") against Defendants DIRECTV, LLC and DirectSat USA, LLC (hereinafter, "Defendants")[1]. The FAC alleged violations of the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 201, *et seq.*; the Illinois Wage Payment and Collection Act; and the Illinois Employee Classification Act. Defendants filed Motions to Dismiss [94, 100], pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted. On September 23, 2015, this Court granted Defendants' Motions to Dismiss. On October 23, 2015, Plaintiffs filed a Second Amended Complaint ("SAC") against Defendants. The SAC alleges one count under the FLSA, alleging overtime wage violations. Defendants have filed Motions to Dismiss [131, 135] pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6). For the reasons discussed below, Defendants' Motions to Dismiss [131, 135] are denied.

## BACKGROUND

DIRECTV is a Delaware corporation with its principal place of business in

---

[1] Plaintiffs Steven Earhart, Milan Puljezevic, and Mario Romero bring their claims solely against DIRECTV. Plaintiffs Ricardo Anaya, David Blake, Javier Cruz, Danyale Gage, Bill Intzekotis, Daniel Sobieszek, and Andrew Cyprien bring their claims against DIRECTV and DirectSat.

El Segundo, California. (SAC ¶ 16.) DirectSat is a Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania. (*Id.* at ¶ 17.) Plaintiffs are individuals residing in Illinois. (*Id.* at ¶¶ 6-15.) Plaintiffs worked as satellite television installation technicians whose principal duty was to install and repair DIRECTV satellite television service. (*Id.* at ¶ 21.) Plaintiffs were treated as 1099 independent contractors. (*Id.* at ¶ 22.)

DIRECTV controls and manages their service technicians by either employing them directly ("W-2 Employees") or through an employment network of service providers (the "Provider Network") consisting of Home Service Providers ("HSPs"), including DirectSat, Secondary Services Providers ("Secondary Providers"), subcontractors, and service technicians. (*Id.* at ¶ 23.) DIRECTV was the primary client of the HSPs and Secondary Providers and was the source of substantially all of their income. (*Id.* at ¶ 26.) DIRECTV gives Providers advance payments in order to keep Providers afloat. (*Id.* at ¶ 46.) DIRECTV has absorbed several Providers through acquisition. (*Id.* at ¶¶ 46-47.) DIRECTV controls the Provider Network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers then enter into contracts with largely captive entities that DIRECTV refers to as subcontractors; and those subcontractors then enter into contracts with the technicians who install the satellite television equipment. (*Id.* at ¶ 28.) In some cases, the HSPs and Secondary Providers contract directly with technicians. (*Id.*). DirectSat passed along scheduling from DIRECTV and provided supervision of technicians. (*Id.* at ¶ 30.) DirectSat maintained a contractor file for each technician working for them. (*Id.* at ¶ 30.) The files were regulated and audited by DIRECTV. (*Id.*) DirectSat had the ability to enter into and terminate contracts with the 1099 technicians.

2

(*Id.* at ¶ 31.) DirectSat also maintained warehouses where 1099 technicians had to pick up some equipment and take some training. (*Id.* at ¶ 34.)

Technicians installed DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards required by DIRECTV. (*Id.* at ¶ 33.) DIRECTV uses Provider Agreements to ensure that technicians perform their work as specified, and Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements. (*Id.* at ¶¶ 34, 36.) The Provider Agreements control almost all facets of the technicians' work. (*Id.* at ¶ 37.) Each technician is assigned a work order through a centralized computer software system that DIRECTV controls. (*Id.* at ¶ 38.) DIRECTV mandates certain methods and standards of installation. (*Id.* at ¶ 35.) Because of this, each technician's job duties are virtually identical. (*Id.*) DIRECTV used a database program known as SIEBEL to coordinate the assignment of work orders to technicians using a unique "Tech ID Number" for each technician. (*Id.* at ¶ 40.) Upon arriving at each work site, technicians were required to check-in with DIRECTV. (*Id.* at ¶ 42.) After an assigned job, technicians were required to report to DIRECTV that the installation was complete. (*Id.*) Through the Providers system, DIRECTV controls the details of Plaintiffs' day-to-day work and compensation. (*Id.* at ¶ 60.)

Plaintiffs were required to purchase and wear uniforms with DIRECTV insignia on them and to display DIRECTV insignia on vehicles driven to customers' homes. (*Id. at ¶* 43.) Plaintiffs were also made to hold themselves out as agents of DIRECTV. (*Id.* at ¶ 80.) DIRECTV also requires that all technicians pass pre-screening and background checks and obtain a certification from the Satellite Broadcasting & Communications Association before they

could be assigned work orders.  (*Id.* at ¶ 70.)  Plaintiffs were also required to purchase supplies necessary to perform installations and required to provide all maintenance and purchase all gas for the vehicles they drove between customers' homes.  (*Id.* at ¶ 106.)

Plaintiffs were compensated on a piece-rate payment scheme that is utilized throughout DIRECTV's network.  (*Id.* at ¶ 85.)  Under the piece-rate system, technicians are paid on a per-task basis for certain "productive" tasks.  (*Id.* at ¶ 101.)  Plaintiffs were not compensated for assembling satellite dishes, transportation to and from assignments, reviewing and receiving schedules, contacting customers to confirm installations, obtaining required supplies, assisting other technicians, performing required customer education, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on installations where Plaintiffs had to return and perform additional work on previously completed installations ("rollbacks").  (*Id.* at ¶ 102)  There was no contract, memorandum, or other document between Plaintiffs and Defendants, memorializing or explaining the pay system.  (*Id.* at ¶ 99.)

DIRECTV and Providers' quality-control personnel reviewed Plaintiffs' work and imposed "chargebacks" and/or "rollbacks" based on those reviews.  (*Id.* at ¶ 87.)  Chargebacks were deductions from technicians' pay if there were issues with an installation or questions from a customer.  (*Id.* at ¶ 105.)  Some issues included:  faulty equipment, improper installation, customer calls on how to operate their remote control, and customers' failure to give greater than a ninety-five percent satisfaction rating for the services provided.  (*Id.*)

Plaintiffs allege that they were routinely required to work more than forty hours per week, while being denied overtime pay.  (*Id.* at ¶ 110.)

**LEGAL STANDARD**

To properly state a claim, the plaintiff must present "a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought . . . ." Fed. R. Civ. P. 8. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to withstand a 12(b)(6) motion, a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, at 1939. Plaintiffs are not required to "plead the elements of a cause of action along with facts supporting each element." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 517 (7th Cir. 2015). The complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, at 544-555). Under Rule 12(b)(6), the court accepts the complaint's well-pleaded factual allegations as true, and all reasonable inferences are construed in the plaintiff's favor. *Twombly*, at 555-56.

**ANALYSIS**

*FLSA*

Plaintiffs allege that Defendants violated the FLSA by failing to pay overtime wages and failing to pay minimum wage. Defendants argue that Plaintiffs have not shown that an employer-employee relationship existed for the purposes of the FLSA. Employer is defined as

5

including "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The "FLSA contemplates several simultaneous employers who may be responsible for compliance with the FLSA." *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011) (citing *Falk v. Brennan*, 414 U.S. 190, 191 (1973)). "Two or more employers may jointly employ someone for the purpose of the FLSA." *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207 (7th Circ. 1986); *see also* 29 C.F.R. § 791.2. For a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee. *See Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (quoting *Moreau v. Air France*, 343 F.3d 1179, 1182 (9th Cir. 2003)).

> Under the Department of Labor's regulations:
>
> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as: (1) where there is an arrangement between the employers to share the employee's services, such as to interchange employees; or (2) where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b); *see also Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 608 (7th Cir. 2014).

Courts look at several factors to determine whether an entity is a joint employer, including whether the alleged employer: "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments,

6

(3) determined the rate and method of payment, and (4) maintained employment records." *Moldenhauer*, 536 F.3d at 644. The FLSA "has been construed liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 2011 (1959). "A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a). The economic reality of the situation controls whether the FLSA applies. *See Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).

Power to Hire and Fire Employees

Defendants contend that Plaintiffs have not sufficiently alleged Defendants had the power to hire or fire them. Plaintiffs allege Defendants authorized subcontracting principals to hire Plaintiffs to perform DIRECTV work only if they met DIRECTV's non-discretionary pre-hire conditions, including that Plaintiffs: (1) complete DIRECTV's New Hire training and the Satellite Broadcasting & Communications Association Certified Installer Training, (2) pass a criminal background check, and (3) pass a nine-panel drug screen. (SAC ¶ 70.) But Plaintiffs concede that DIRECTV and the HSP Defendants did not accept applications or interview potential candidates. However, Plaintiffs contend Defendants nonetheless determined who could and could not be hired to install DIRECTV systems. (*Id.* ¶¶ 68-69.) Plaintiffs also allege Defendants retained the ultimate and unilateral authority to terminate their employment by de-authorizing their technician ID number and prohibiting Plaintiffs from continuing to receive work orders. (*Id.* ¶¶ 64, 71-72.)

As pled, DIRECTV "unquestionably plays a role in hiring and firing technicians." *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010). DIRECTV does set some standards for the hiring of technicians and maintains and distributes lists of poorly performing technicians. (SAC, ¶¶ 75-76). Plaintiffs also allege that DirectSat had the power to enter into and terminate contracts with technicians. (*Id.* at ¶ 31.) Plaintiffs have sufficiently pled that Defendants had influence over the hiring and/or firing process.

Supervision and Control

Defendants argue that Plaintiffs' assertions that DIRECTV "directly and indirectly" supervised their "work schedules and conditions of employment" are insufficient to establish a joint-employer relationship. Plaintiffs allege Defendants retained authority to control and did control all meaningful conditions of Plaintiffs' employment. Specifically, DIRECTV promulgated mandatory rules, policies, and practices regarding the manner and method by which installations were to be performed. (*Id.* ¶¶ 33-35, 79.) DIRECTV contractually obligated DirectSat to hand down these rules and policies to all technicians. (*Id.* at ¶¶ 36-37.) DIRECTV developed and provided mandatory training, which it required of all technicians, including Plaintiffs. (*Id.* at ¶¶ 32, 82.)

DIRECTV maintained an online scheduling and management system to schedule, track, and manage all DIRECTV installation work performed by Plaintiffs. (*Id.* ¶¶ 29, 78.) DIRECTV created daily work orders and assigned them to Plaintiffs. (*Id.* ¶ 42.) Furthermore, DIRECTV required all technicians, including Plaintiffs, to wear DIRECTV uniforms, drive the DIRECTV-branded vehicles and display DIRECTV-marked credentials. (*Id.* ¶ 40.) Plaintiffs also allege Defendants supervised and controlled them through personnel monitoring and post-installation

8

customer surveys. (*Id.* ¶¶ 75-77.) Defendants measured Plaintiffs' work performance against metrics they developed, circulated reports identifying low-performing technicians, and demanded improvement from bottom-performing technicians. (*Id.* ¶¶ 76-77.)

Defendants argue that these requirements are "quality assurance measures." (Dkt. 113 at 14.) "[D]etailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship." *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690 (D. Md. 2010). However, the conduct Plaintiffs allege goes beyond quality control. Plaintiffs allege that they were given work orders by Defendants, who then monitored and tracked Plaintiffs, evaluated that work, and demanded improvement when necessary. Plaintiffs have plausibly alleged control and supervision by Defendants.

## Rate and Method of Payment

Plaintiffs admit that Defendants did not pay the Plaintiffs but argue that the compensation method was set by and ultimately funded by DIRECTV. There are no specific allegations that DIRECTV or DirectSat set Plaintiffs' rate and method of payment. Rather Plaintiffs allege that DIRECTV "sets an amount it is willing to pay for certain defined tasks." (SAC ¶ 85.) These allegations remain substantively unchanged from the FAC. While DIRECTV determined what tasks were compensable and what tasks were not, there is no allegation that they determined the rate for compensation. Further, Plaintiffs admit that Providers, and not DIRECTV, paid Plaintiffs using their own payroll and paycheck systems. Plaintiffs have not sufficiently alleged that DIRECTV and DirectSat determined the rate and method of payment.

9

Employment Records

Plaintiffs admit that DIRECTV does not keep employment-related records. (*Id.* ¶ 90.) DIRECTV does require HSPs to retain paperwork on technicians, which is subject to inspection by DIRECTV. (*Id.*) DIRECTV assigned Plaintiffs and all other subcontractor technicians a unique identification number. (*Id.* ¶¶ 41.) Through the SIEBEL system, DIRECTV maintained records of the work orders completed by Plaintiffs, as well as other performance, personal, and payroll data. (*Id.* ¶ 91.) Plaintiffs have sufficiently alleged that DirectSat kept paperwork/personnel files for each of its technicians. (*Id.* ¶ 90.)

Joint Employer

Plaintiffs have alleged that Defendants had some control over hiring and firing and exerted substantial control and supervision over Plaintiffs' work schedules and conditions of employment. Taking all well-pleaded factual allegations as true, making all reasonable inferences in Plaintiffs' favor, and considering the liberal scope of the FLSA, Plaintiffs have plausibly alleged that Defendants were joint employers for the purposes of the FLSA.

*Limitations Period*

Defendants incorporate their previous arguments, from the first Motions to Dismiss, regarding the limitations period. Defendants argue that Plaintiffs fail to state a claim under the FLSA for recovery beyond a two-year period. "[E]xcept for cases of willful violations, claims under the FLSA must be brought within two years of the violation." *Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995). In contrast, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

Willful violations are those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "[A]n employer's mere negligence or a good faith − but incorrect − belief that they were in compliance with the FLSA, are not sufficient to rise to the level of a willful violation." *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 425 (S.D.N.Y. 2008).

Defendants claim that Plaintiffs have not sufficiently alleged willfulness to allow for a three-year limitations period. Plaintiffs have alleged that "Defendants' unlawful conduct was willful because . . . DIRECTV and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits." (SAC ¶ 182.) Plaintiffs have sufficiently alleged willfulness to extend the limitations period to three years.

*Overtime*

Defendants incorporate their previous arguments, from the first Motions to Dismiss, regarding overtime wages. "Under the FLSA, a nonexempt employee who works more than forty hours in a given week must be compensated for those excess hours." *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1014 (N.D. Ill. 2013) (citing 29 U.S.C. § 207(a)(1)). As several appellate courts have found, Plaintiffs' allegations that they typically worked for more than forty hours a week and were not compensated for all time worked is sufficient to withstand a motion to dismiss. *See Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3d Cir. 2014) ("a plaintiff's claim that she 'typically' worked forty hours per week, worked extra hours during such

11

a forty-hour week, and was not compensated for extra hours beyond forty hours he or she worked during one or more of those forty-hour weeks, would suffice."); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (". . . in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."); *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 645 (9th Cir. 2014) ("A plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility."). Plaintiffs have sufficiently alleged that they worked in excess of forty hours a week without being fully compensated.

*Claim Splitting*

Defendant DIRECTV also seeks to dismiss Plaintiff Romero's FLSA claim, arguing that it is improper claim splitting. The doctrine of claim splitting "bars a party from maintaining a suit that arises from the transaction or events underlying a previous suit simply by changing their legal theory" and "can be applied before either action reaches a final judgment on the merits." *Anderson v. Guaranteed Rate, Inc.*, No. 13 C 431, 2013 WL 2319138, at *4 (N.D. Ill. May 28, 2013). Defendants argue that Romero remains part of a class action in Missouri for similar claims against DIRECTV. Plaintiffs respond that the current suit is for different times than the Missouri action and that Plaintiff was an independent contractor for the current action and a W-2 employee for the Missouri action. Defendants reply that it is unclear from the SAC whether the claims overlap or not. The SAC specifically states that the claims do not overlap. (SAC ¶ 113, n. 21) Taking all well-pleaded factual allegations as true and construing all

reasonable inferences in Plaintiffs' favor, Romero's claim in the current action does not arise from the same transaction or event underlying the Missouri action. Therefore, Plaintiff Romero's claims are not precluded by claim splitting.

*Rule 8*

Defendants also ask that the Complaint be dismissed due to violations of Federal Rule of Civil Procedure 8. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation shall be simple, concise, and direct." Fed.R.Civ.P. 8(a)(2), (d)(1). Defendants argue that the Complaint unnecessarily includes multiple references to legal authority, as well as several footnotes of legal citation. Defendants also argue that the Complaint is, at times, contradictory. This may be true; however, "when the complaint adequately performs the notice function prescribed for complaints by the civil rules, the presence of extraneous matter does not warrant dismissal." *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820-21 (7th Cir. 2001). The Complaint adequately performs the notice function, and, therefore, the presence of extraneous material does not warrant dismissal.

## CONCLUSION

For the reasons set forth above, Defendants' Rule 12(b)(6) Motions to Dismiss [131, 135] are denied. Defendants' Motions to Dismiss pursuant to Rule 8 are denied.

Date: _____April 7, 2016_____  _____
JOHN W. DARRAH
United States District Court Judge

13